*1055351980*



IN THE DISTRICT COURT OF ROGERS COUNTY
STATE OF OKLAHOMA

MAY 19 2023

CATHLEDWARDS, COURT CLERK

DEPUTY

LAURIE WEDIN and THOMAS R. UTZIG,

Plaintiffs,

vs.

ALLSTATE VEHICLE AND
PROPERTY INSURANCE COMPANY
and SHOEMAKE AGENCY, LLC,

Defendants.

CASE NO.

CJ-2023-181

## PETITION

Plaintiffs Laurie Wedin and Thomas R. Utzig (collectively "Plaintiffs"), for their causes of action against Defendants Allstate Vehicle and Property Insurance Company ("Allstate") and Shoemake Agency, LLC ("Shoemake") (collectively, "Defendants"), hereby allege and state as follows:

## PARTIES

1.     Plaintiffs Laurie Wedin and Thomas R. Utzig are residents and citizens of Rogers County, State of Oklahoma.

2.     Plaintiffs entered into a contract of insurance with Allstate to provide replacement cost coverage for Plaintiffs' residence, household contents, and other structures (collectively, Plaintiffs' "Insured Property"). Plaintiffs purchased an Allstate homeowners' replacement cost insurance policy, Policy No. 821669482 (the "Policy"), through the offices of Shoemake. At the time Plaintiffs purchased the Policy from Defendants, Shoemake was an agent and/or ostensible agent of Allstate.

3.     Allstate is a foreign insurer licensed to do business in Oklahoma.

1

4.      Shoemake is domestic limited liability company operating as an Allstate agency in Claremore, Oklahoma, located in Rogers County, State of Oklahoma.

5.      Venue is proper pursuant to 12 O.S. § 137.

## FACTUAL BACKGROUND

6.      Plaintiffs contacted Shoemake to serve as Plaintiffs' insurance agent. Plaintiffs requested Shoemake obtain a replacement cost policy that would provide coverage for Plaintiffs' Insured Property in the event of a loss (*i.e.*, replacement coverage). To that end, Plaintiffs disclosed specific concerns and insurance needs to Shoemake. Above all, given Oklahoma's extreme weather, Plaintiffs specifically requested a policy that would fully replace Plaintiffs' roof in the event of a loss, without exclusion of any weather-related losses. Shoemake assured Plaintiffs Shoemake could obtain the requested coverage and help find the most appropriate coverage for Plaintiffs.

7.      Plaintiffs were particularly concerned about their roof and asked Shoemake to obtain for them full replacement cost coverage for their roof above and beyond what the base policy provided.[1] Shoemake told Plaintiffs the only way to obtain the coverage they requested was by purchasing a Roof Surface Extended Coverage Endorsement ("Roof Endorsement"). Shoemake advised Plaintiffs that while adding a Roof Endorsement would increase their premium, the additional cost was worth it because it provided coverage that would *fully replace* their roof in the event of a covered loss, without conditions or exclusions.

---

[1] Under an Actual Cash Value ("ACV") policy, the true replacement cost is depreciated by factoring in the age and condition of the roof, which causes a shortfall in the money available to complete repairs. A base policy provides only a percentage of replacement cost for roof surfaces damaged by windstorm or hail.

2

8.      Shoemake assured Plaintiffs this was true because their roof had to first qualify for the coverage before the Roof Endorsement could be added to the Policy. Therefore, the age, condition, and predominate roof surface materials would not only affect the eligibility for a Roof Endorsement, but also would dictate the calculation of the additional premium associated with the purchase of these endorsements. To determine the roof's eligibility, an inspection would have been necessary and required. In the event the roof was ineligible for the requested Roof Endorsement (*i.e.*, old, worn, in poor condition, defective workmanship or otherwise affected by pre-existing conditions), Shoemake had an independent duty to report the same to Plaintiffs and to Allstate. However, neither Shoemake nor Allstate advised Plaintiffs at any time before the loss that their roof was too old, worn, in poor condition, or plagued by pre-existing damage or defective workmanship that would exclude them or render them ineligible for the Roof Endorsement they specifically requested and paid for.

9.      Because the inclusion of the Roof Endorsement came at an additional cost, Shoemake was solely responsible for calculating the replacement cost values, as determined by Shoemake, by factoring in accurate information regarding the age, physical condition, and type of shingle of Plaintiffs' roof. Shoemake admittedly did these calculations utilizing Allstate's valuation software.

10.     Allstate considers its agents—here, Shoemake—to be the first line of underwriting. As the first line of underwriting, Allstate requires its agents to conduct an inspection of the Insured Property before Allstate will issue replacement cost coverage. Once coverage issues, Allstate requires its agents (like Shoemake) to maintain current information about the Insured Property via periodic inspections thereafter. Among other things, Shoemake was to independently verify the condition of the Insured Property, take accurate measurements of the dwelling and roof, and obtain

3

and independently confirm information regarding the Insured Property's amenities and construction quality. Indeed, to qualify for full replacement cost coverage on the roof (as opposed to actual cash value, "ACV"), Shoemake was required to verify the roof's condition to ensure it satisfied Allstate's underwriting guidelines.

11.    With this, the roof's age, condition, and predominate surface materials were all factors that not only affected Plaintiffs' eligibility to obtain replacement cost coverage for Plaintiffs' roof, but also dictated the calculation of the increased premium associated with this type of coverage. In order to determine the roof's eligibility, an inspection by Shoemake would have been necessary and required. Indeed, Shoemake expressly conditioned Plaintiffs' insurance coverage options on said inspection and the Insured Property's conformance with Allstate's underwriting guidelines. In the event the roof was ineligible for the requested replacement cost coverage (i.e., old, worn, in poor condition, or otherwise affected by pre-existing conditions), Shoemake had an independent duty to report the same to Plaintiffs and Allstate.

12.    Neither Shoemake nor Allstate advised Plaintiffs at any time that Plaintiffs' roof was ineligible for the requested replacement cost coverage due to it being too old, worn, in poor condition, plagued by pre-existing damage/issues, or any other reason. Likewise, neither Shoemake nor Allstate ever advised Plaintiffs that Plaintiffs' roof had any pre-existing damage or other conditions that would exclude or limit application of the roof's replacement cost coverage.

13.    Rather, Shoemake specifically advised and represented to Plaintiffs that the roof was in good condition, satisfied all of Allstate's guidelines and underwriting requirements (i.e., its age, physical condition, workmanship etc.), and therefore qualified and was eligible for full replacement cost coverage (versus ACV)—the best policy Allstate offered. Shoemake represented to Plaintiffs that he did, in fact, procure coverage that would fully restore the Insured Property and

4

roof to its pre-loss condition in the event of damage and/or loss (no matter the extent of damage sustained).

14.    Shoemake then procured, and Allstate issued, a homeowners' full replacement cost insurance policy, Policy No. 821669482 (the "Policy") covering Plaintiffs' Insured Property (including the roof). Shoemake assured Plaintiffs the Policy provided the broadest form of coverage available today and, despite the associated increased premium costs, was an outstanding value for Plaintiffs' insurance dollars.

15.    In procuring the Policy for Plaintiffs, Shoemake also independently established, calculated, and set the Policy's replacement cost limits. Shoemake purportedly based the Policy's replacement costs limits on his inspection, measurements, and calculations, which would capture and account for any customized or specialty components of the Insured Property. Further, Shoemake calculated the Policy's replacement cost limits—which directly affect Plaintiffs' premiums—as if Plaintiffs' home was in perfect condition. Shoemake represented that his replacement cost calculation reflected the specific dollar amount Plaintiffs are actually reasonably likely to incur in replacing their specific property (*i.e.*, 100% insurance-to-value).

16.    Neither Shoemake nor Allstate required or otherwise asked Plaintiffs to calculate or request a specific amount of coverage for the Insured Property. Instead, Shoemake asked general questions about the Insured Property, and, aside from answering those questions, Plaintiffs had no input regarding the amount of coverage Shoemake independently selected and calculated. Then, Shoemake recommended and represented to Plaintiffs that they should insure Plaintiffs' Insured Property to 100% of its replacement cost value, as determined by Shoemake utilizing Allstate's valuation software and information from Shoemake's purported inspection.

17. At all relevant times, Shoemake represented itself as an expert—highly proficient in using Allstate's valuation software, which Shoemake further represented as a reliable and accurate tool. Given Shoemake's purported expertise and specialized knowledge of insurance policies, Plaintiffs reasonably relied on Shoemake's representations. Other than answering Shoemake's questions, Plaintiffs had no input in Shoemake's replacement cost calculations.

18. Shoemake was required by Allstate's internal policies to confirm the accuracy of any information it gathered to calculate the replacement cost, as well as confirm the accuracy of any pre-filled data the replacement cost software tool auto-populated. Shoemake was required to independently verify both the pre-filled information the tool provided, as well as the specific information concerning the grade and quality of materials in Plaintiffs' home. Shoemake assured Plaintiffs that the amount of coverage he independently selected and calculated was accurate, correct, commensurate with actual reconstruction costs, and represented 100% of the Insured Property's insurance to value, such that Plaintiffs would be able to fully restore the Insured Property without incurring out-of-pocket expenses in the event of a loss.

19. Given Shoemake's purported expertise and specialized knowledge of insurance policies, Plaintiffs reasonably relied on Shoemake's representations. Other than answering Shoemake's questions, Plaintiffs had no input in Shoemake's replacement cost calculations.

20. Allstate further represented to Plaintiffs, directly and through its agent (Shoemake), that Allstate would conduct itself in accordance with Oklahoma law and would fully and fairly investigate and pay claims. Plaintiffs also relied on said representations. In this regard, Shoemake represented to Plaintiffs that under the Policy, in the event of a covered loss, Plaintiffs would be fully, fairly and timely compensated for replacement costs relating to their dwelling and personal property up to their Policy limits.

21.    Having assured Plaintiffs that Plaintiffs' Insured Property met all underwriting guidelines and that Plaintiffs' Insured Property and roof qualified for the replacement cost coverage, Shoemake procured, and Allstate issued, the replacement cost policy (with the Roof Surfaces Extended replacement coverage for the roof) and issued premium statements, which Plaintiffs—relying on Shoemake's assurances—timely paid. At all times material hereto, the subject Policy remained in full force and effect, and Plaintiffs complied with the terms and conditions thereof.

22.    On or about May 21, 2022, Plaintiffs' Insured Property (including the roof, siding and soft metals) was damaged as a result of a wind and hail storm. Plaintiffs timely notified Allstate of the storm damage.

23.    On May 27, 2022, Allstate sent a Claim Acknowledgement Letter to Plaintiffs informing them that Allstate received Plaintiffs' claim and are working on it. Allstate represented to Plaintiffs that it would "work to resolve your claim quickly and fairly." However, Allstate did not stay true to its word.

24.    On May 31, 2022, Allstate, by and through a gentleman by the name of Mark from Hancock Claims Consultants ("Hancock"), inspected Plaintiffs' Insured Property. Mark spent about fifteen (15) minutes on the roof, came down and told Plaintiffs they had a lot of wind and hail damage to the roof, and there was no problem with their claim. Hancock told Plaintiffs that he is contracted with Allstate to inspect the roof.

25.    Subsequently Plaintiffs received a telephone from Allstate call denying the claim because of improper installation which caused zippering, thereby ignoring the damage confirmed by Allstate's independent adjuster (Hancock).

26.     On June 7, 2022, Allstate (through adjuster Stephanie Ross) prepared an estimate for $156.25 on an ACV basis. The estimate was prepared for water damage sustained to Plaintiffs' kitchen, family room, and bath. Inexplicably, despite conceding water had in fact caused damage to the interior of Plaintiffs' home, Allstate's estimate was limited to sealing and painting over wet sheetrock. Allstate's estimate also failed to include any damage to Plaintiffs' roof for wind and/or hail damage.

27.     Also on June 7, 2022, Plaintiffs received a form letter from Allstate denying the claim fully—that Plaintiffs would receive no benefits under the Policy for the wind/hail damage to their Insured Property (including the roof). In the letter, Allstate denied that the roof was damaged and attributed the damage to workmanship, repair and construction on Plaintiffs' roof, which Allstate informed was not a covered loss.

28.     Plaintiffs disagreed with Allstate's assessment. Accordingly, on June 30, 2022, Plaintiffs retained Sky Diamond Adjusting LLC and its Public Adjusters (collectively "Sky Diamond") to assist Plaintiffs with their storm damage claim.

29.     Plaintiffs received a rude hateful phone call from a man in Illinois with Allstate saying, "[s]ince you have contacted a public adjuster implying that the claim was closed, do what you have to do." The telephone call was so shocking that the Plaintiffs did not know how to respond.

30.     On July 13, 2022, Sky Diamond submitted an estimate for repairs to the roof along with photographs of the damages to the Insured Property (including the roof) to Allstate and requested a re-inspection of Plaintiffs' Insured Property. The initial estimate prepared by Sky Diamond was for wind and hail damage to the roof for $20,914.09 on an RCV basis. Sky Diamond

informed Allstate that Plaintiffs had sustained damages to the interior of the Insured Property as well that could be addressed with Allstate at a joint on-site inspection.

31.    On July 19, 2022, Steven Monroe, Allstate claims-adjuster, responded by sending a copy of the denial letter.

32.    While Sky Diamond observed far more damage to Plaintiffs' Insured Property (including the roof) as evidenced by the estimates, photographs and other information submitted to Allstate, it refused all requests for a re-inspection contending nothing submitted constituted "new evidence" and that the adjustment of Plaintiffs' claim stands as a denial.

33.    Allstate's denial of Plaintiffs' claim is predicated upon a systemic, state-wide Scheme designed to increase denials and/or decrease payments on valid roof claims. Under the Scheme, Allstate (1) wrongfully denies (in whole or in part) valid roof claims; (2) provides its insureds with false justification for the wrongful denials, typically through its adjusters' or agents' misrepresentations; and (3) actively and fraudulently conceals its wrongful denials and the Scheme as a whole from its insureds. In furtherance of the Scheme, Allstate (a) underscopes and undervalues damages by attributing much of the damage to non-covered, pre-existing issues without or in direct contravention of a pre-Policy-inception inspection or reinspection; (b) limits claim payments to damage caused by only the rarest and most severe hail storms, which Allstate accomplishes by ignoring hail damage that does not penetrate the shingle mat (i.e., non-penetrative damage like hail impacts, bruises, and granular loss does not constitute "functional" damage—and so is not covered); (c) denies wind damage by relegating damage to non-covered, pre-existing workmanship issues or installation defects; (d) prevents policyholders from exercising their full rights following a denial or underpayment by inappropriately back-dating the date of loss; and (e)

escapes making claim payments altogether by utilizing inaccurate and inconsistent "estimating software" to calculate replacement cost coverages and damage estimates.

34.    For every instance of the Scheme (including its treatment of Plaintiffs), Allstate wrongfully denied valid roof claims without conducting a full and fair investigation thereof. Specifically, Allstate is prohibited from denying a claim due to non-covered causes or pre-existing damage unless Allstate can substantiate those denial grounds with an inspection that *predates the inception of coverage and/or reinspection every five years thereafter.* This requirement arises under both Oklahoma law and Allstate's own guidelines, policies, and procedures. Without a prior inspection, Allstate deprives Plaintiffs of valuable evidence showing the condition of the roof before the storm. Allstate thereby deprives Plaintiffs of any meaningful opportunity to cure noted deficiencies, if any. Allstate's denial based on pre-existing damage constitutes bad faith.

35.    Here, neither Shoemake nor Allstate identified and/or notified Plaintiffs of any workmanship issues with Plaintiffs' roof, including shingles being improperly nailed, prior to inception of Plaintiffs' Policy, nor did either advise of any condition that would exclude replacement cost coverage. To the contrary, on November 3, 2020, Shoemake sent Plaintiffs the result of its property inspection results, proudly touting, "We did not find any issues that impact our ability to continue your current coverage and you do not need to do anything further at the moment." In making these represenstaitons, Shoemake specifically represented the purpose of the inspeciton was to identify "conditions on [Plaintiffs] home's exterior that might might [their] future insurance coverage."

36.    Considering the presence of "improperly nailed (high  nailed) shingles" existed at the time of this property inspection, Shoemake's representations when issuing and renewing the policy (*i.e.*, in good condition and wear, eligible for full replacement coverage (versus ACV), and

satisfying Allstate's guidelines and underwriting requirements) and Allstate's position in denying the claim do not square. Specifically, Shoemake (as Allstate's agent) sold and/or renewed Plaintiffs' Policy and made affirmative representations as to the roof's condition while in knowing violation of Oklahoma law and Allstate's guidelines, policies, and procedures.

37.     The manner in which Allstate handled Plaintiffs' valid roof claim illustrates Allstate's Scheme and clearly demonstrates Allstate's bad faith. Allstate denied Plaintiffs' roof claim under the guise of pre-existing workmanship defects (a non-covered cause of loss under Plaintiffs' Policy). Allstate denied the claim despite the November 3, 2020, property inspection (or any other inspection) to support its contention. Further, Allstate impermissibly limited the scope of Plaintiffs' claim by narrowly interpreting what constitutes "hail and wind damage" under the Policy without disclosing that interpretation in the Policy.

38.     Allstate's denial based on preexisting damage and narrow interpretation of hail and wind damage does not square with Shoemake's representations and assurances about the Policy's coverage, the existence and outcome of a pre-inception inspection, and the Policy's replacement cost values and related premium calculations associated with Plaintiffs' purchase of the Roof Endorsement. Plaintiffs' Policy did not provide coverage as Shoemake promised. And year after year, renewal after renewal, Shoemake made and stood on the same failures and misrepresentations, all to Plaintiffs' detriment.

39.     Allstate engaged in a company-wide scheme and pervasive practice of systematically denying homeowners' claims through pretextual use and utilization of estimating software to underpay policyholders without adequately examining the validity of each individual claim. These schemes are orchestrated by Allstate's most senior leadership to reduce indemnity payments due to its policyholders and preserve its surplus (premium) at any cost.

11

40.    Allstate achieved its business goals in the adjustment of Plaintiffs' claim by utilizing "estimating software" it knew was inaccurate to calculate a damage estimate to ensure the repairs to Plaintiffs' Insured Property (including the roof) fell below the deductible and so as to knowingly underpay/deny Plaintiffs' claim.

41.    Plaintiffs had no means to discover that they would not be paid the Policy's full replacement cost benefits until after the ensuing claim. Despite demand, Allstate has failed and/or refused to pay all monies due and payable under the terms of the subject Policy.

## COUNT I
## BREACH OF CONTRACT

42.    Plaintiffs fully incorporate into this paragraph each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein, and for additional claims *against Allstate* hereby allege as follows:

43.    Plaintiffs entered into a contract of insurance (their Policy) with Allstate to provide homeowner's insurance for Plaintiffs' Insured Property. Plaintiffs' Policy was in full force and effect at all material times hereto.

44.    Wind and/or hail caused significant damage to Plaintiffs' Insured Property (including the roof). Plaintiffs provided proper and timely notice to Allstate of the damage by filing a claim.

45.    Plaintiffs' Policy coverage includes all fortuitous losses—which necessarily includes damage sustained by wind and hail. The Policy language does not define wind or hail damage and equally fails to distinguish hail damage coverage based on whether hail penetrates the shingle mat, nor does it make any distinction as to "cosmetic" damage.

46.    Plaintiffs have in all material ways complied with the terms and conditions of the Policy.

47.    Allstate breached its contractual obligations under the terms and conditions of the Policy with Plaintiffs by failing to pay Plaintiffs all benefits to which they are entitled under the terms and conditions of the Policy and for wrongfully underpaying and denying portions of Plaintiffs' claim.

48.    Consistent with Allstate's pervasive, state-wide fraudulent Scheme, Allstate actively, intentionally, and fraudulently concealed its Scheme to deny and/or underpay valid hail damage claims from Plaintiffs. This concealment is an inherent and important aspect of Allstate's Scheme; Allstate knew its Scheme would work only if it was kept secret.

49.    As a result of Allstate's breach of contract and other wrongful conduct, Plaintiffs have been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs, and interests.

## COUNT II
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

50.    Plaintiffs fully incorporate into this paragraph each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein, and for additional claims *against Allstate* hereby allege as follows:

51.    At all relevant times hereto, Allstate owed Plaintiffs a duty of good faith and fair dealing.

52.    Allstate knowingly, intentionally, purposefully, wrongfully, and repeatedly breached its duty to deal fairly and in good faith by engaging in the following acts and omissions:

a.    Selling a full replacement coverage endorsement on Plaintiffs' roof which failed to provide replacement cost coverage when the roof was damaged by a covered loss;

b.    refusing, without proper cause, to pay Plaintiffs all benefits they are owed

13

under the Policy and pursuant to Oklahoma law;

c.      engaging in an outcome-oriented investigation on Plaintiffs' claim designed to deny and/or reduce the amount of money paid to Plaintiffs under the Policy;

d.      disregarding the documented wind speeds and hailstorm;

e.      misattributing hail damage by either back-dating the loss to older storm events or disavowing any damage caused by older storms that exceed one-year from the date the claim was made;

f.      limiting Plaintiffs' rights;

g.      reducing the fair amount of Plaintiffs' claim;

h.      withholding pertinent benefits, coverages, and other provisions due to Plaintiffs under the terms and conditions of the Policy in violation of the Unfair Claims Settlement Practices Act, 36 O.S. §§1250.1-1250.16;

i.      forcing Plaintiffs to retain counsel to recover insurance benefits to which they are entitled under the terms and conditions of the Policy;

j.      engaging in the improper claims practices enumerated herein knowing that its insured would suffer financial harm;

k.      failing to

  i.      engage in proper claims handling practices;

  ii.     pay Plaintiffs the full and fair amount for the hail damage they sustained to Plaintiffs' Insured Property in accordance with the Policy's terms and conditions;

  iii.    perform a proper, timely, fair, and objective investigation of

14

Plaintiffs' damages and claim;

    iv.    inspect the Insured Property prior to inception of the coverage and/or maintain current information as to the condition of the Insured Property prior to the loss;

    v.    communicate all coverages and benefits applicable to Plaintiffs' claim;

    vi.    base its refusal to recognize and pay Plaintiffs benefits owed under the Policy for damages caused by wind and/or hail on a reasonable basis;

    vii.    notify Plaintiffs, both prior to and at the inception and renewal of the Policy, of any pre-existing damage and other conditions that, if a claim were made, would limit coverage in order to overinflate premiums to maximize Allstate's financial gains;

    viii.    disclose to Plaintiffs Allstate's lack of compliance with its own underwriting guidelines, policies, and procedures in denying coverage to Plaintiffs on the basis of pre-existing damage without the support of a prior inspection;

l.    utilizing

    i.    valuation software to calculate the replacement cost of Plaintiffs' Insured Property, knowing such software was inaccurate and systematically and methodically designed to overinflate premiums to maximize Allstate's financial gains;

    ii.    a combination of claim estimating software and unit pricing it knew

to be inaccurate to calculate a damage estimate to systematically and methodically underpay homeowners' claims, including that of Plaintiffs;

m.    engaging in a pattern and practice of

i.    denying claims or ensuring damage claims fall below the deductible;

ii.    outcome-oriented investigations and claims handling practices;

iii.    denying indemnity payments owed to its first-party insureds on valid hail claims, including Plaintiffs, including denial and underpayment of Plaintiffs' claim;

iv.    ignoring hail damage that does not penetrate the shingle mat, and/or intimating or disregarding opinions and findings of independent roofers so as to perpetuate its fraud and further its Scheme of denying all but the most severe hail damage in dereliction of the policy coverage and claim guidelines;

v.    adjusting Plaintiffs' claim in an arbitrary and capricious way;

vi.    using an arbitrary and capricious distinction between hail bruising and hail fracture—even though both compromise the integrity and longevity of a roof—as means of denying and/or underpaying all but the most severe roof damage claims;

vii.    disregarding granular loss as evidence of hail damage—even though it compromises the integrity and longevity of a roof—as means of arbitrarily and capriciously denying and/or underpaying all but the most severe roof damage claims;

viii.    refusing arbitrarily and capriciously to issue indemnity payments owed to insureds (including Plaintiffs);

ix.    ignoring hail damage that does not penetrate the shingle mat so as to proffer a scripted denial that hail bruising or granular loss does not constitute hail damage, which Allstate intended to, and in fact did, use to rubber-stamp its prejudged bad faith claims handling practices;

x.    disregarding opinions and findings of independent roofers so as to proffer a scripted denial that hail bruising or granular loss does not constitute hail damage, which Allstate intended to, and in fact did, use to rubber-stamp its prejudged bad faith claims handling practices;

xi.    relegating clear wind and hail damage to non-covered, pre-existing defective installation of shingles and workmanship so as to deny valid roof claims;

xii.    denying insured's claims (including Plaintiffs' claim) based on pretextual findings of pre-existing damage; and

xiii.    a fraudulent Scheme that included the concealment through both positive acts and omissions, the sham nature of its investigations and findings, the fraudulent basis for the denial of coverage under Plaintiffs' valid insurance Policy, and other critical aspects of the Scheme.

53.    Allstate's conduct, as described above, constitutes bad faith and is a material breach of the terms and conditions of the Policy and its underlying insurance contract between the parties. Allstate has no reasonable basis in its refusal to recognize and pay Plaintiffs the agreed replacement cost as per the Policy for damages caused by the wind and hail damage to Plaintiffs' Insured Property.

54.    As a consequence of Allstate's breach of the duty of good faith and fair dealing, Plaintiffs have sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering that naturally results from an insurance failure and have been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

55.    Allstate's conduct was intentional, willful, malicious, and/or in reckless disregard of the rights of others.

56.    Allstate's actions during the handling of Plaintiffs' claim demonstrate it acted intentionally, acted with malice, and breached its duty to deal fairly and in good faith. Allstate's actions were malicious and consistent with an overall collective corporate goal of increasing profits through the systematic underpayment and denial of claims. Allstate's conduct is sufficiently egregious in nature so as to warrant the imposition of punitive damages.

57.    Plaintiffs further allege Allstate enjoyed increased financial benefits and ill- gotten gains as a direct result of the wrongful conduct described above herein, which resulted in injury to Plaintiffs.

## COUNT III
## NEGLIGENT PROCUREMENT OF INSURANCE

58.    Plaintiffs fully incorporate into this paragraph each and every allegation in the

18

preceding paragraphs of this Petition as if each were fully iterated verbatim herein, and for additional claims *against Defendants Shoemake and Allstate* hereby allege as follows:

59.     At all material times hereto, Shoemake acted as the agent, employee or ostensible agent of Allstate, and Allstate is vicariously liable for the conduct of Shoemake.

60.     Shoemake owed duties to Plaintiffs, including but not limited to Shoemake's obligation to:

    a.     accurately inform and advise Plaintiffs of all coverages, benefits, risks, limitations, and exclusions thereof; and

    b.     perform a reasonable inspection of the Insured Property prior to procuring the replacement cost coverage and thereafter upon renewal to ensure no changes to the Policy were necessary or required.

61.     Shoemake is a captured agent of Allstate, and as such, serves as the first line of underwriting for Allstate. Accordingly, Shoemake was required to (among other obligations):

    a.     know of the specific property to be insured, including the condition of the roof and the quality and grade of materials in the property;

    b.     inspect Plaintiffs' Insured Property (including the roof) and independently verify its condition prior to the Policy's inception and confirm the Insured Property was acceptable to Allstate, consistent with its internal underwriting guidelines; and

    c.     maintain current information about the same for each renewal. In the event the roof was plagued by wear, tear, deterioration, defective workmanship, pre-existing damage, was over the age of ten years at the time of Shoemake's inspection or was otherwise ineligible for the requested

coverage under Allstate's guidelines and requirements, then Shoemake had an independent duty to report the same to Plaintiffs and to Allstate.

62.    Shoemake was negligent and/or breached the duties owed to Plaintiffs by (at least):

a.    Failing to

i.    procure and renew an all-risk replacement cost policy that provided coverage for all fortuitous losses and any weather-related damage (even cosmetic)—big or small—regardless of the severity, nature or type;

ii.    confirm at issuance and at each renewal whether the Insured Property (including the roof) met all underwriting guidelines, particularly with regard to the condition and workmanship of the roof and pre-existing damage;

iii.    follow and abide by Allstate's underwriting policies/guidelines and failing to perform all necessary inspections of the Insured Property at issuance and at each renewal;

iv.    confirm the accuracy of the pre-filled information provided by Allstate's replacement cost estimating tool at issuance and at each renewal;

v.    report defective workmanship or improper "hail nail" installation of the shingles at issuance and at each renewal;

vi.    report defective workmanship or improper "hail nail" installation of the shingles in the November 3, 2020, property inspection letter;

vii.    report pre-existing damage to the Insured Property in order to

overinflate Plaintiffs' Policy limits and premiums at issuance and at each renewal;

viii. accurately and truthfully answer Plaintiffs' questions regarding the Policy coverages at issuance and at each renewal.

b. Procuring and renewing

i. illusory coverage by purportedly providing full replacement coverage on Plaintiffs' Insured Property (including the roof);

ii. a full replacement coverage endorsement on Plaintiffs' roof, which failed to provide replacement cost coverage when the roof was damaged by a covered loss;

iii. a Policy purporting to provide full replacement coverage on Plaintiffs' Insured Property (including the roof) that does not realistically provide the coverage promised, given the exceedingly narrow and rare circumstances in which hail damage is covered;

iv. a Policy purporting to provide full replacement coverage on Plaintiffs' Insured Property (including the roof) that does not realistically provide the coverage promised, given the identified defective workmanship or improper "hail nail" installation of the shingles which nullified and excluded coverage;

v. a Policy which did not accurately reflect the replacement cost of Plaintiffs' Insured Property (i.e., an amount that was 100% insurance to value as promised);

vi. a Policy (with calculated coverages) that, as written, does not

provide coverage to fully restore Plaintiffs' Insured Property back to its pre-loss condition, in contradiction to what Plaintiffs were promised;

c.   Reporting to Allstate and Plaintiffs that the Insured Property (including the roof) was in good condition and met all underwriting requirements prior to the inception of coverage and thereafter with each renewal;

d.   Reporting to Allstate and Plaintiffs that the Insured Property (including the roof) was in good condition and met all underwriting requirements on November 3, 2020;

e.   Utilizing valuation software to calculate replacement cost values knowing such software was inaccurate and in no way commensurate with the estimating software used in claims; and

f.   Utilizing valuation software to calculate the replacement cost of Plaintiffs' Insured Property, knowing such software was inaccurate and systematically and methodically designed to overinflate premiums to maximize the Defendants' financial gains.

63.    Based on Shoemake's representations and duties to Plaintiffs, Plaintiffs reasonably believed the Policy conformed to Plaintiffs' discussions and agreement with Shoemake.

64.    Plaintiffs relied on Shoemake's representations. Based on Shoemake's representations, Plaintiffs trusted and believed Shoemake had the requisite insurance agent skills and expertise to properly procure the insurance coverage Plaintiffs requested—including full replacement cost coverage for Plaintiffs' roof—especially since Plaintiffs explicitly disclosed Plaintiffs' insurance needs. Specifically, Plaintiffs relied on Shoemake to procure a replacement

cost policy that,

    a.    set forth coverages that represented 100% of the actual cost to repair and/or replace the subject Insured Property (including the roof) back to its pre-loss condition in the event of a loss;

    b.    reflected accurate replacement cost values that were commensurate with actual reconstruction costs based on the condition and specific amenities and details of their home and roof, and

    c.    would provide coverage on all fortuitous losses—big or small, "functional" or cosmetic, without exception, exclusion, or limitation—including any and all weather-related damage.

65.    Shoemake knew (or should have known) Plaintiffs relied on its representations that Plaintiffs' Insured Property had met all underwriting requirements, that all inspections had occurred, and that the coverage was as he represented. Especially following the November 3, 2020, letter wherein Shoemake specifically represented a recent inspection revealed there were no issues or conditions that impacted Plaintiffs' ability to continue their current coverage or ability to recover benefits under the policy in the event of a loss. Further, it was foreseeable that failure to procure coverage as Plaintiffs requested and Shoemake promised could unnecessarily expose Plaintiffs to significant harm, losses, and damages.

66.    As a result of Defendants' conduct, Plaintiffs have sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering, and have been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

67.     Defendants' conduct was intentional, willful, malicious and in reckless disregard of the rights of the Plaintiffs and is sufficiently egregious in nature so as to warrant the imposition of punitive damages.

## COUNT IV
## CONSTRUCTIVE FRAUD AND NEGLIGENT MISREPRESENTATION

68.     Plaintiffs fully incorporate into this paragraph each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein, and for Plaintiffs' additional claims against *Defendants Shoemake and Allstate* hereby allege as follows:

69.     Shoemake represented to Plaintiffs that Allstate homeowners' insurance would provide the necessary protection for Plaintiffs' Insured Property. In doing so, Shoemake not only represented to Plaintiffs it was an expert in the insurance industry, but also possessed the experience to get the dependable, comprehensive full replacement coverage that would cover all accidental losses (no matter the severity) without any limitations, exclusions, or conditions to meet Plaintiffs' specific insurance needs.

70.     Shoemake further touted to Plaintiffs its ability to customize homeowners' coverage to meet the specific needs of Plaintiffs. By this, Shoemake represented to Plaintiffs that Allstate sold the comprehensive coverage they requested, but given the expansive nature of the requested coverage, the Insured Property (and more specifically the roof) would first have to qualify by meeting all underwriting guidelines and pass a property inspection. These requirements are based on the training and underwriting materials Allstate provides to each of its captive agents. Allstate's agents are bound to adhere to this training and to the underwriting guidelines per their contracts with Allstate.

24

71.    In furtherance of these assurances, Shoemake specifically congratulated Plaintiffs on November 3, 2020, representing to them that their home passed Allstate's required property inspection in that no issues or conditions were identified that would affect their ability to continue with the current coverage or ability to recover policy benefits in the event of a loss.

72.    Shoemake had a duty to exercise reasonable diligence and skill in obtaining and accurately notifying Plaintiffs of the nature and character of the insurance procured.

73.    Shoemake breached the duties he owed to Plaintiffs by misrepresenting and/or concealing pertinent material facts from Plaintiffs, as follows:

    a.    Selling and renewing illusory replacement cost insurance coverage on the roof and representing to Plaintiffs at the time the Policy was issued and with each renewal that Plaintiffs' roof met all underwriting guidelines and that any damage (regardless of the severity) sustained to the roof would be fully replaced knowing such statement was untrue.

    b.    Misrepresenting to Plaintiffs in the November 3, 2020, letter that there were no issues or conditions with their Insured Property (including the roof) that would affect their coverage or ability to recover policy benefits in the event of a loss like they experienced.

    c.    Misrepresenting to Plaintiffs at the time the Policy was procured and with each renewal, as follows:

        i.    the Insured Property (including the roof) met all underwriting requirements;

        ii.    the Insured Property (including the roof) was in good condition;

        iii.    the Insured Property (including the roof) had no pre-existing issues

with the Insured Property that would limit or restrict coverage in the event of either a partial or total loss;

iv.   the roof did not have any issues or conditions would limit or restrict coverage in the event of either a partial or total loss;

v.   the roof did not have any defective workmanship or improper "hail nail" installation of the shingles that would limit or restrict coverage in the event of either a partial or total in good condition;

vi.   the Insured Property (including the roof) was eligible for the comprehensive full replacement coverage (rather than ACV) based on the roof's age and condition so to overinflate premiums to maximize the Defendants' financial gains;

vii.   the Policy provided the requested comprehensive full replacement coverage;

viii.   the Policy was not subject to any exclusions, limitation, or conditions;

ix.   the Policy covered all fortuitous losses;

x.   the Policy fully covered weather-related damage (even cosmetic, whether big or small);

xi.   Shoemake was an expert, who was proficient in accurately calculating replacement cost values using Allstate's valuation software;

xii.   Shoemake applied first-hand knowledge he obtained from inspections of Plaintiffs' Insured Property (including the structure,

26

roof, specific amenities, construction qualities, age, and condition) to calculate the replacement cost values using Allstate's valuation software;

xiii.    the replacement cost valuation (as calculated by Shoemake) was accurate and commensurate with current market and reconstruction costs in an amount necessary for Plaintiffs to replace and/or rebuild Plaintiffs' Insured Property back to its pre-loss condition in the event of a loss;

xiv.    the replacement cost valuation (and as calculated by Shoemake), and for which premiums were paid, was equal to the estimated replacement cost (100% insurance-to-value);

xv.    the valuation software utilized was accurate and commensurate with the estimating software that would be used in claims;

xvi.    Defendants    followed    and    met    Allstate's    underwriting policies/guidelines; and

xvii.    Defendants properly conducted all necessary inspections of the Insured Property.

74.    Each of the forgoing representations were false. Indeed, Allstate's captive agents cannot bind a replacement cost policy without first affirmatively representing that the property to be insured satisfies Allstate's underwriting guidelines. Should the property fail to satisfy the guidelines, the policy cannot bind. Accordingly, in every instance wherein an Allstate agent issues a replacement cost policy, the agent must first represent the home meets Allstate's underwriting guidelines. This representation necessarily includes a representation that the home is free from pre-

27

existing damage that would violate those same guidelines. Indeed, properties with pre-existing damage, including and especially defective workmanship and/or improper "hail nail" installation of the shingles, do not qualify under these guidelines and are deemed an unacceptable risk to Allstate. Had Shoemake not represented Plaintiffs' Insured Property met Allstate's underwriting guidelines, the Policy would not have been issued. To the contrary, had Shoemake identified the defective workmanship and/or improper "hail nail" installation of the shingles in the November 3, 2020, letter Plaintiffs' property inspection results would have been unacceptable, and Plaintiffs would have been unable to continue their current coverage without correcting the deficiencies. Shoemake's false representation of the condition of the Insured Properties ensured continuance and renewal of coverage to Plaintiffs detriment.

75.    As a result of Shoemake's breach of duty, he gained an advantage for himself by misleading Plaintiffs to Plaintiffs' prejudice.

76.    Shoemake's misrepresentations constitute constructive fraud.

77.    Plaintiffs were induced to accept, purchase, and renew the Allstate replacement cost policy (with a full coverage endorsement for the roof) by Shoemake's misrepresentations and constructive fraud.

78.    Plaintiffs were misled by Shoemake's misrepresentations and constructive fraud. Plaintiffs relied on Shoemake's misrepresentations to Plaintiffs' detriment.

79.    Shoemake is the agent and/or ostensible agent of Allstate for purposes of these misrepresentations, and as such is vicariously liable for them.

80.    As a result of the Defendants' constructive fraud and misrepresentation, Plaintiffs have sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering, and have

been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

81.    Defendants' conduct was intentional, willful, malicious, and in reckless disregard of the rights of the Plaintiffs and/or was grossly negligent. Defendants' conduct is sufficiently egregious in nature to warrant the imposition of punitive damages.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Laurie Wedin and Thomas R. Utzig pray for judgment against Defendants Allstate Vehicle and Property Insurance Company and Shoemake Agency, LLC for:

(a)    Actual and punitive damages each in an amount in excess of $75,000.00;

(b)    Disgorgement of the increased financial benefits derived by any and/or all of the Defendants as a direct result of the Defendants' wrongful conduct; and

(c)    Prejudgment interests, costs and attorneys' fees.

Respectfully submitted,

Jeff D. Marr, OBA
#16080 Carole Dulisse,
OBA #18047 **MARR LAW FIRM**
4301 Southwest Third Street
Oklahoma City, Oklahoma 73108
Telephone: (405) 236-8000
Facsimile: (405) 236-8025
Email: jeffdmarr@marrlawfirm.com
        cdulisse@marrlawfirm.com

*-and-*

29

Reggie N. Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
J. Revell Parrish, OBA No. 30205
**WHITTEN BURRAGE**
512 North Broadway Avenue, Suite 300
Oklahoma City, OK 73102
Telephone:    405.516.7800
Facsimile:    405.516.7859
Email: rwhitten@whittenburragelaw.com
        mburrage@whittenburragelaw.com
        rparrish@whittenburragelaw.com

*-and-*

Chad E. Ihrig, OBA No. 19491
Bradley W. Beskin, OBA No. 35314
**NIX PATTERSON, LLP**
8701 Bee Cave Road
Building 1, Suite 500
Austin, Texas 78746
Telephone:    512.328.5333
Facsimile:    512.328.5335 Email:
cihrig@nixlaw.com

*-and-*

Nick Marr, OBA No. 34284
Ashton Poarch, OBA No. 34308
**NIX PATTERSON, LLP**
512 N. Broadway Avenue, Suite
200 Oklahoma City, Oklahoma
73102 Email: nmarr@nixlaw.com
        apoarch@nixlaw.com

*-and-*

George Gibbs, OBA #11843
**Gibbs Armstrong. P.C.**
2021 South Lewis Avenue, Suite 410
Tulsa, Oklahoma 74104
Telephone:    918-587-3939
Facsimile:    918-582-5504
ggibbs@gablawyers.com
*ATTORNEYS FOR PLAINTIFFS*

**ATTORNEYS' LIEN CLAIMED**
**JURY TRIAL DEMANDED**