

**IN THE DISTRICT COURT OF CLEVELAND COUNTY**
**STATE OF OKLAHOMA**

TAYLOR AUSTIN,

    Plaintiff,

vs.

ALLSTATE VEHICLE AND
PROPERTY INSURANCE COMPANY
AND STANSEL INSURANCE
AGENCY, INC.,

    Defendants.

CASE NO. CJ-2024-524

*(filing stamp: STATE OF OKLAHOMA, CLEVELAND COUNTY s.s. FILED APR 16 20 In the office of the Court Clerk MARILYN WILLIAMS)*

## PETITION

COMES NOW the Plaintiff Taylor Austin ("Plaintiff"), and for her causes of action against Defendants Allstate Vehicle and Property Insurance Company ("Allstate") and Stansel Insurance Agency, Inc. ("Stansel") (collectively "Defendants"), hereby alleges and states as follows:

## PARTIES

1.    Plaintiff Taylor Austin is a resident and citizen of Norman, Cleveland County, State of Oklahoma.

2.    Plaintiff purchased an Allstate homeowners' replacement cost insurance policy, Policy No. 845040552 (the "Policy"), through the offices of Elise Stansel, owner of Defendant Stansel Insurance Agency, Inc. on or about November 2022. At the time Plaintiff purchased the Policy from Defendants, Stansel was an agent and/or implied or apparent agent of Allstate.

3.    Allstate is a foreign insurer licensed to do business in Oklahoma.

4.    Defendant Stansel Insurance Agency, Inc. is domestic corporation operating as an Allstate agency located at 709 Wall Street, in Norman, Cleveland County, Oklahoma.

5.    Venue is proper pursuant to 12 O.S. § 137.

1

## FACTUAL BACKGROUND

6.      Plaintiff purchased her home at 1301 Sawgrass Dr. in Norman, Oklahoma on or about July 2021 (the "Insured Property"). At the time that Plaintiff purchased the Insured Property, Palladium Roofing conducted and prepared a roof inspection dated June 25, 2021, finding that the roof in question was "in good condition." Palladium also found that although there was some pea size hail damage to the soft metal exhaust vents and caps, there were "No signs of hail damage to the shingles."   Plaintiff obtained homeowners' insurance thorough SafeCo.  Plaintiff's SafeCo policy insured her roof for 100% replacement cost value and noted that the subject roof had been fully replaced in 2015.

7.      Sometime in 2022, Plaintiff reached out to Stansel regarding a potential change in her homeowners' insurance from SafeCo to Allstate.  Based on the representations and promises of Stansel regarding coverage, Plaintiff entered into a contract of insurance with Allstate to provide replacement cost coverage for Plaintiff's residence, household contents, and other structures on the Insured Property.  Plaintiff requested Stansel obtain a replacement cost policy that would provide coverage for Plaintiff's Insured Property in the event of a loss (*i.e.*, replacement coverage) similar to or greater than that of Plaintiff's SafeCo policy, which insured her roof for 100% replacement cost value. To that end, Plaintiff disclosed specific concerns and insurance needs to Stansel. Stansel assured Plaintiff that Stansel could obtain the requested coverage and help find the most appropriate coverage for Plaintiff, including her roof considering Oklahoma's extreme weather.  Stansel then procured, and Allstate issued, a homeowners' replacement cost insurance policy, Policy No. 821669482 (the "Policy") covering Plaintiff's Insured Property (including the roof). Stansel assured Plaintiff the Policy provided the broadest form of coverage available and was an outstanding value for Plaintiff's insurance dollars.

8.      Plaintiff believed at all times that her roof was covered at 100% of its replacement cost value similar to what she enjoyed with her SafeCo policy.  However, unbeknownst to the Plaintiff, Stansel insured Plaintiff's roof not at 100%, but at a discounted 67% replacement cost value.  At no time did Stansel communicate to the Plaintiff that her roof had been discounted for its age (alleging it to be 11 years as stated in the Policy) to only 67% of roof surface replacement cost for windstorm or hail damage.  Had Plaintiff been made aware of this reduction from 100% to 67%, Plaintiff would not have switched her policy to Allstate.

9.      Stansel is the first line of underwriting for Allstate and is required to conduct an inspection of the Insured Property. Among other things, Stansel was to independently verify the condition of the Insured Property, accurately take measurements of the dwelling, and obtain information pertaining to the amenities and construction quality of the dwelling. Indeed, in order to qualify for replacement cost coverage on the roof (as opposed to actual cash value) that Plaintiff had requested, she was required to verify the condition of the roof to ensure its condition satisfied Allstate's underwriting guidelines.  Stansel was also under a duty to speak, disclose, and explain to Plaintiff that the Allstate Policy at issue would only cover her roof at 67% replacement cost value.

10.     With this, the age, condition, and predominate roof surface materials were all factors that affected the eligibility to obtain replacement cost coverage on a roof.  In order to determine the roof's eligibility, an inspection by Stansel would have been necessary and required. In the event the roof was ineligible for 100% replacement cost coverage (*i.e.*, old, worn, in poor condition or otherwise affected by pre-existing conditions), Stansel had an independent duty to report the same to both Plaintiff and to Allstate.  Stansel reported that the roof was 11 years old yet SafeCo's policy expressly states that the roof was fully replaced in 2015.

3

11.    Neither Stansel nor Allstate advised Plaintiff at any time that her roof was too old, worn, in poor condition, or plagued by pre-existing damage/issues which would exclude coverage or render the roof ineligible for replacement cost coverage that Plaintiff requested and paid for. At no time did Stansel or Allstate advise Plaintiff that her replacement cost coverage for her roof had been discounted to 67% from the 100% coverage under her SafeCo policy or that there was any previous hail damage or defective workmanship that would jeopardize any future claim.

12.    Plaintiff believed that Allstate directly and through its agent, Defendant Stansel, would conduct themselves in accordance with Oklahoma law and would fully and fairly investigate and pay claims in good faith.

13.    On or about April 19, 2023, Plaintiff's home and roof was damaged as a result of a wind and hailstorm. As Plaintiff had a $3,400.00 windstorm and hail deductible, Plaintiff tried to save money prior to filing a claim to replace the roof. Plaintiff eventually contacted Allstate about the damage caused by the wind and hailstorm in January 2024 as she was attempting to sell her house.

14.    Following the April 2023 hailstorm, both neighbors living to the side of the Plaintiff received full roof replacements from their insurance companies and the two neighbors across the street did as well. However, after filing her claim with Allstate, Plaintiff received an email denying her claim for a full roof replacement. Plaintiff received an estimate from Allstate in the amount of $1,483.99 for various damages and otherwise denying that her roof needed to be replaced.

15.    In denying the full roof replacement on Plaintiff's claim, Allstate determined that certain "anomalies to a roof" are not necessarily from hail damage. Allstate claimed that Plaintiff's roof had blemishes and anomalies caused by "blistering and exposure (rain, temp. changes, foot traffic, etc."

4

16. In response to Allstate's denial of a full roof replacement, Plaintiff secured estimates from three (3) separate roofing companies. Palladium Roofing, which had previously determined the roof was in "good condition" in June 2021, recommended a full roof replacement based on hail damage. Preferred Roofing also inspected Plaintiff's roof and found that a full roof replacement was warranted from wind and hail damage, estimating the cost at $21,999.67. Finally, Acts 29 Roofing, LLC inspected the subject roof and again found that the roof needed a full replacement, estimating replacement at $15,500.00.

17. Allstate's denial of Plaintiff's hail claim is predicated upon a systemic practice of (a) attributing much of the damage to preexisting issues, defective construction, (b) implementing a state-wide practice of ignoring hail damage that does not penetrate the shingle mat: that is according to Allstate claims handling practices, granular loss, hail impacts and bruises don't constitute damage unless they penetrates the back side of the mat—which by design effectively limits payment under the policy to only the rarest and most severe hail storms, and (c) by utilizing "estimating software" it knew was inaccurate to calculate a damage estimate so as to knowingly escape any payment on Plaintiff's claim.

18. Allstate is engaged in a state-wide scheme and pervasive practice of systematically denying and/or underpaying valid roof claims. These schemes are orchestrated by Allstate by (1) wrongfully denying (in whole or in part) valid roof claims; (2) providing its insureds with a false justification for the wrongful denial or through adjuster or agent misrepresentations; and (3) actively and fraudulently concealing its scheme from its insureds.

19. For every instance of the scheme, Allstate wrongfully denied (in whole or in part) valid roof claims by issuing wrongful denials without conducting a full and fair investigation of the claim. Specifically, Allstate was prohibited from denying a claim on the basis that the claimed

5

damage resulted from another cause unless Allstate first conducted an inspection of the roof property *prior to the inception of coverage*. This requirement arises under both Oklahoma law, as well as Allstate's own guidelines, policies, and procedures. Without such prior inspection, Allstate's denial on the basis of a pre-existing condition was in bad faith. Allstate, through its agent, never conducted a pre-inception and/or renewal inspection of Plaintiff's home and/or roof. Nevertheless, the agent sold and/or renewed Plaintiff's Policy and made affirmative representations as to the condition of said roof while in knowing violation of Allstate's own guidelines, policies, and procedures.

20.    Allstate, in furtherance and as part of its scheme, additionally attempted to provide cover and justification for its wrongful denials and/or underpayment of valid hail claims by concocting false justifications or reasons for denial and/or underpayment of valid hail claims. Allstate used these false justifications with its Oklahoma insureds to ensure the scheme's success.

21.    The manner in which Allstate handled Plaintiff's claim illustrates Allstate's scheme and clearly demonstrates Allstate's bad faith claims handling of Plaintiff's valid roof claim. Allstate denied Plaintiff's roof claims through a practice of excluding all hail damage that does not penetrate the shingle mat and relegating all but the most severe hail damage as noncovered preexisting damage under policy exclusions, despite the fact it failed to perform a pre-inception and/or periodic renewal inspection (or any other required inspection) demonstrating the claimed damage was, in fact, preexisting.

22.    Plaintiff had no means to discover that she would not be paid her full or even discounted replacement cost benefits until after the ensuing claim. Despite demand, Allstate has failed and/or refused to pay all monies due and payable under the terms of the subject Policy.

23.    Neither Stansel nor Allstate advised Plaintiff at any time before the loss that her roof was too old, worn, in poor condition, or plagued by pre-existing damage or defective workmanship that would exclude her or render her ineligible for the Roof Endorsement benefits that Plaintiff paid for, either in full or via a reduced percentage. At no time was Plaintiff informed that her Allstate Policy would only cover 67% of replacement value of her roof, which was a significant reduction from the 100% replacement cost value policy she had with SafeCo.

24.    As a result of Allstate's denial, Plaintiff was forced to pay Preferred Roofing $16,639.00 in March 2024 for a full roof replacement.

25.    At all times material hereto, the subject Policy remained in full force and effect, and Plaintiff complied with the terms and conditions thereof.

## COUNT I
## BREACH OF CONTRACT

26.    Plaintiff fully incorporates into this paragraph each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein, and for additional claims *against Allstate* hereby allege as follows:

27.    Plaintiff entered into a contract of insurance (the Policy) with Allstate to provide homeowner's insurance for Plaintiff's Insured Property. Plaintiff's Policy was in full force and effect at all material times hereto.

28.    Wind and/or hail caused significant damage to Plaintiff's Insured Property (including the roof). Plaintiff provided notice to Allstate of the damage by filing a claim.

29.    Plaintiff's Policy coverage includes all fortuitous losses—which necessarily includes damage sustained by wind and hail. The Policy language does not define wind or hail damage and equally fails to distinguish hail damage coverage based on whether hail penetrates the shingle mat, nor does it make any distinction as to "cosmetic" damage.

30.    Plaintiff has in all material ways complied with the terms and conditions of the Policy.

31.    Allstate breached its contractual obligations under the terms and conditions of the Policy with Plaintiff by failing to pay Plaintiff all benefits to which she is entitled under the terms and conditions of the Policy and for wrongfully underpaying and denying portions of Plaintiff's claim.

32.    Consistent with Allstate's pervasive, state-wide fraudulent scheme, Allstate actively, intentionally, and fraudulently concealed its scheme to deny and/or underpay valid hail damage claims from Plaintiff.

33.    As a result of Allstate's breach of contract and other wrongful conduct, Plaintiff has been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs, and interest.

## COUNT II
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

34.    Plaintiff fully incorporates into this paragraph each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein, and for additional claims *against Allstate* hereby allege as follows:

35.    At all relevant times hereto, Allstate owed Plaintiff a duty of good faith and fair dealing under Oklahoma law.

36.    Allstate knowingly, intentionally, purposefully, wrongfully, and repeatedly breached its duty to deal fairly and in good faith by engaging in the following acts and omissions:

a.    refusing, without proper cause, to pay Plaintiff all benefits she is owed under the Policy and pursuant to Oklahoma law;

b.    engaging in an outcome-oriented investigation on Plaintiff's claim designed

to deny and/or reduce the amount of money paid to Plaintiff under the Policy;

c.    disregarding the documented wind speeds and hailstorm;

d.    misattributing hail damage by either back-dating the loss to older storm events or disavowing any damage caused by older storms that exceed one-year from the date the claim was made;

e.    limiting Plaintiff's rights;

f.    reducing the fair amount of Plaintiff's claim;

g.    withholding pertinent benefits, coverages, and other provisions due to Plaintiff under the terms and conditions of the Policy in violation of the Unfair Claims Settlement Practices Act, 36 O.S. §§1250.1-1250.16;

h.    forcing Plaintiff to retain counsel to recover insurance benefits to which she is entitled under the terms and conditions of the Policy;

i.    engaging in the improper claims practices enumerated herein knowing that its insured would suffer financial harm;

j.    failing to

   i.    engage in proper claims handling practices;

   ii.    pay Plaintiff the full and fair amount for the hail damage she sustained to Plaintiff's Insured Property in accordance with the Policy's terms and conditions;

   iii.    perform a proper, timely, fair, and objective investigation of Plaintiff's damages and claim;

   iv.    inspect the Insured Property prior to inception of the coverage

9

and/or maintain current information as to the condition of the Insured Property prior to the loss;

v.      communicate all coverages and benefits applicable to Plaintiff's claim;

vi.     base its refusal to recognize and pay Plaintiff benefits owed under the Policy for damages caused by wind and/or hail on a reasonable basis;

vii.    notify Plaintiff, both prior to and at the inception and renewal of the Policy, of any pre-existing damage and other conditions that, if a claim were made, would limit coverage in order to overinflate premiums to maximize Allstate's financial gains;

viii.   disclose to Plaintiff Allstate's lack of compliance with its own underwriting guidelines, policies, and procedures in denying coverage to Plaintiff on the basis of pre-existing damage without the support of a prior inspection;

k.      utilizing

i.      valuation software to calculate the replacement cost of Plaintiff's Insured Property, knowing such software was inaccurate and systematically and methodically designed to overinflate premiums to maximize Allstate's financial gains;

ii.     a combination of claim estimating software and unit pricing it knew to be inaccurate to calculate a damage estimate to systematically and methodically underpay homeowners' claims, including that of

Plaintiff;

l.    engaging in a pattern and practice of

    i.    denying claims or ensuring damage claims fall below the deductible;

    ii.    outcome-oriented investigations and claims handling practices;

    iii.    denying indemnity payments owed to its first-party insureds on valid hail claims, including Plaintiff, including denial and underpayment of Plaintiff's claim;

    iv.    ignoring hail damage that does not penetrate the shingle mat, and/or intimating or disregarding opinions and findings of independent roofers so as to perpetuate its fraud and further its Scheme of denying all but the most severe hail damage in dereliction of the policy coverage and claim guidelines;

    v.    adjusting Plaintiff's claim in an arbitrary and capricious way;

    vi.    using an arbitrary and capricious distinction between hail bruising and hail fracture—even though both compromise the integrity and longevity of a roof—as means of denying and/or underpaying all but the most severe roof damage claims;

    vii.    disregarding granular loss as evidence of hail damage—even though it compromises the integrity and longevity of a roof—as means of arbitrarily and capriciously denying and/or underpaying all but the most severe roof damage claims;

    viii.    refusing arbitrarily and capriciously to issue indemnity payments owed to insureds (including Plaintiff);

11

ix.   ignoring hail damage that does not penetrate the shingle mat so as to proffer a scripted denial that hail bruising or granular loss does not constitute hail damage, which Allstate intended to, and in fact did, use to rubber-stamp its prejudged bad faith claims handling practices;

x.   disregarding opinions and findings of independent roofers so as to proffer a scripted denial that hail bruising or granular loss does not constitute hail damage, which Allstate intended to, and in fact did, use to rubber-stamp its prejudged bad faith claims handling practices;

xi.   relegating clear wind and hail damage to non-covered, pre-existing defective installation of shingles and workmanship so as to deny valid roof claims;

xii.   denying insured's claims (including Plaintiff's claim) based on pretextual findings of pre-existing damage; and

xiii.   a fraudulent scheme that included the concealment through both positive acts and omissions, the sham nature of its investigations and findings, the fraudulent basis for the denial of coverage under Plaintiff's valid insurance Policy, and other critical aspects of the Scheme.

37.   Allstate's conduct, as described above, constitutes bad faith and is a material breach of the terms and conditions of the Policy and its underlying insurance contract between the parties. Allstate has no reasonable basis in its refusal to recognize and pay Plaintiff the agreed replacement

12

cost as per the Policy for damages caused by the wind and hail damage to Plaintiff's Insured Property.

38.    As a consequence of Allstate's breach of the duty of good faith and fair dealing, Plaintiff has sustained damages, including deprivation of monies rightfully belonging to Plaintiff, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering that naturally results from an insurance failure and have been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

39.    Allstate's conduct was intentional, willful, malicious, and/or in reckless disregard of the rights of others.

40.    Allstate's actions during the handling of Plaintiff's claim demonstrate it acted intentionally, acted with malice, and breached its duty to deal fairly and in good faith. Allstate's actions were malicious and consistent with an overall collective corporate goal of increasing profits through the systematic underpayment and denial of claims, including paying for full roof replacements. Allstate's conduct is sufficiently egregious in nature so as to warrant the imposition of punitive damages.

41.    Plaintiff further alleges Allstate enjoyed increased financial benefits and ill-gotten gains as a direct result of the wrongful conduct described above herein, which resulted in injury to Plaintiff.

## COUNT III
## NEGLIGENT PROCUREMENT OF INSURANCE

42.    Plaintiff fully incorporates into this paragraph each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein, and for additional claims *against Defendants Stansel and Allstate* hereby allege as follows:

43.    At all material times hereto, Stansel acted as the agent, employee or ostensible agent

13

of Allstate, and Allstate is vicariously liable for the conduct of Stansel.

44.    Stansel owed duties to Plaintiff, including but not limited to Stansel's obligation to:

a.    accurately inform and advise Plaintiff of all coverages, benefits, risks, limitations, and exclusions thereof; and

b.    perform a reasonable inspection of the Insured Property prior to procuring the replacement cost coverage and thereafter upon renewal to ensure no changes to the Policy were necessary or required.

c.    Educate, inform, and disclose that the Allstate Policy procured for the Plaintiff was not a 100% full replacement cost value for the roof as Plaintiff's SafeCo policy.

45.    Stansel is a captured agent of Allstate, and as such, serves as the first line of underwriting for Allstate. Accordingly, Stansel was required to (among other obligations):

a.    know of the specific property to be insured, including the condition of the roof and the quality and grade of materials in the property;

b.    inspect Plaintiff's Insured Property (including the roof) and independently verify its condition prior to the Policy's inception and confirm the Insured Property was acceptable to Allstate, consistent with its internal underwriting guidelines; and

c.    maintain current information about the same for each renewal. In the event the roof was plagued by wear, tear, deterioration, defective workmanship, pre-existing damage, was over the age of ten years at the time of Stansel's inspection or was otherwise ineligible for the requested coverage under Allstate's guidelines and requirements, then Stansel had an independent

14

duty to report the same to Plaintiff and to Allstate.

d.      Educate, inform, and disclose that the Allstate Policy procured for the Plaintiff was not a 100% full replacement cost value for the roof as Plaintiff's SafeCo policy.

46.     Stansel was negligent and/or breached the duties owed to Plaintiff by (at least):

a.      Failing to

i.      procure and renew an all-risk replacement cost policy that provided coverage for all fortuitous losses and any weather-related damage (even cosmetic)—big or small—regardless of the severity, nature or type;

ii.     confirm at issuance and at each renewal whether the Insured Property (including the roof) met all underwriting guidelines, particularly with regard to the condition and workmanship of the roof and pre-existing damage;

iii.    follow and abide by Allstate's underwriting policies/guidelines and failing to perform all necessary inspections of the Insured Property at issuance and at each renewal;

iv.     confirm the accuracy of the pre-filled information provided by Allstate's replacement cost estimating tool at issuance and at each renewal;

v.      report defective workmanship or improper "hail nail" installation of the shingles at issuance and at each renewal;

vi.     report defective workmanship;

15

vii.     report pre-existing damage to the Insured Property in order to overinflate Plaintiffs' Policy limits and premiums at issuance and at each renewal;

viii.     accurately and truthfully answer Plaintiff's questions regarding the Policy coverages at issuance and at each renewal.

ix.     accurately and truthfully disclose to Plaintiff that the Allstate Policy procured for the Plaintiff was not a 100% full replacement cost value for the roof as Plaintiff's SafeCo policy.

b.     Procuring and renewing

i.     illusory coverage by purportedly providing full replacement coverage on Plaintiff's Insured Property (including the roof);

ii.     a roof endorsement on Plaintiff's Policy, which failed to provide replacement cost coverage when the roof was damaged by a covered loss;

iii.     a Policy purporting to provide replacement coverage on Plaintiff's Insured Property (including the roof) that does not realistically provide the coverage promised, given the exceedingly narrow and rare circumstances in which hail damage is covered;

iv.     a Policy purporting to provide replacement coverage on Plaintiff's Insured Property (including the roof) that does not realistically provide the coverage promised;

v.     a Policy which did not accurately reflect the replacement cost of Plaintiff's Insured Property (i.e., an amount that was 100%

insurance to value as promised and previously enjoyed by the plaintiff with her then current SafeCo policy);

vi. a Policy (with calculated coverages) that, as written, does not provide coverage to fully restore Plaintiff's Insured Property back to its pre-loss condition, in contradiction to what Plaintiff was promised;

c. Reporting to Plaintiff that the Insured Property (including the roof) was in good condition and met all underwriting requirements prior to the inception of coverage and thereafter with each renewal;

d. Reporting to Allstate and Plaintiffs that the Insured Property (including the roof) was in good condition and met all underwriting requirements;

e. Utilizing valuation software to calculate replacement cost values knowing such software was inaccurate and in no way commensurate with the estimating software used in claims; and

f. Utilizing valuation software to calculate the replacement cost of Plaintiff's Insured Property, knowing such software was inaccurate and systematically and methodically designed to overinflate premiums to maximize the Defendants' financial gains.

47. Based on Stansel's representations, ommissions, and duties to Plaintiff, Plaintiff reasonably believed the Policy conformed to Plaintiff's discussions and agreement with Stansel.

48. Plaintiff relied on Stansel's representations. Based on Stansel's representations, Plaintiff trusted and believed Stansel had the requisite insurance agent skills and expertise to properly procure the insurance coverage Plaintiff requested—including full replacement cost

17

coverage for Plaintiff's roof—especially since Plaintiff explicitly disclosed Plaintiff's insurance needs. Specifically, Plaintiff relied on Stansel to procure a replacement cost policy that,

    a.    set forth coverages that represented 100% of the actual cost to repair and/or replace the subject Insured Property (including the roof) back to its pre-loss condition in the event of a loss;

    b.    reflected accurate replacement cost values that were commensurate with actual reconstruction costs based on the condition and specific amenities and details of their home and roof, and

    c.    would provide coverage on all fortuitous losses—big or small, "functional" or cosmetic, without exception, exclusion, or limitation—including any and all weather-related damage.

49.    Stansel knew (or should have known) Plaintiff relied on its representations and/or omissions that Plaintiff's Insured Property had met all underwriting requirements, that all inspections had occurred, and that the coverage was as she represented. Further, it was foreseeable that failure to procure coverage as Plaintiff requested and Stansel promised could unnecessarily expose Plaintiff to significant harm, losses, and damages.

50.    As a result of Defendants' conduct, Plaintiff has sustained damages, including deprivation of monies rightfully belonging to Plaintiff, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering, and have been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

51.    Defendants' conduct was intentional, willful, malicious and in reckless disregard of the rights of the Plaintiff and is sufficiently egregious in nature so as to warrant the imposition

18

of punitive damages.

## COUNT IV
## CONSTRUCTIVE FRAUD AND NEGLIGENT
## MISREPRESENTATION

52.     Plaintiff fully incorporate into this paragraph each and every allegation in the preceding paragraphs of this Petition as if each were fully iterated verbatim herein, and for Plaintiffs' additional claims against *Defendants Stansel and Allstate* hereby allege as follows:

53.     Stansel represented to Plaintiff that Allstate homeowners' insurance would provide the necessary protection for Plaintiff's Insured Property. In doing so, Stansel not only represented to Plaintiff it was an expert in the insurance industry, but also possessed the experience to get the dependable, comprehensive full replacement coverage that would cover all accidental losses (no matter the severity) without any limitations, exclusions, or conditions to meet Plaintiff's specific insurance needs.

54.     Stansel further touted to Plaintiff its ability to customize homeowners' coverage to meet the specific needs of Plaintiff. By this, Stansel represented to Plaintiff that Allstate sold the comprehensive coverage she requested, the Insured Property (and more specifically the roof) would first have to qualify by meeting all underwriting guidelines and pass a property inspection. These requirements are based on the training and underwriting materials Allstate provides to each of its captive agents. Allstate's agents are bound to adhere to this training and to the underwriting guidelines per their contracts with Allstate.

55.     Stansel had a duty to exercise reasonable diligence and skill in obtaining and accurately notifying Plaintiff of the nature and character of the insurance procured, including that

19

the Allstate Policy was not a 100% full replacement cost value policy for Plaintiff's roof as was the case in the then current SafeCo policy.

56.     Stansel breached the duties it owed to Plaintiff by misrepresenting and/or concealing pertinent material facts from Plaintiff, as follows:

a.     Selling and renewing illusory replacement cost insurance coverage on the roof and representing to Plaintiff at the time the Policy was issued and with each renewal that Plaintiff's roof met all underwriting guidelines and that any damage (regardless of the severity) sustained to the roof would be fully replaced knowing such statement was untrue.

b.     Misrepresenting and/or failing to disclose to the Plaintiff at the time the Policy was procured and with each renewal, as follows:

i.     the Insured Property (including the roof) met all underwriting requirements;

ii.     the Insured Property (including the roof) was in good condition;

iii.     the Insured Property (including the roof) had no pre-existing issues with the Insured Property that would limit or restrict coverage in the event of either a partial or total loss;

iv.     the roof did not have any issues or conditions would limit or restrict coverage in the event of either a partial or total loss;

v.     the roof did not have any defective workmanship that would limit or restrict coverage in the event of either a partial or total in good condition;

vi.     the Insured Property (including the roof) was eligible for the

comprehensive full replacement coverage (rather than ACV) based on the roof's age and condition so to overinflate premiums to maximize the Defendant's financial gains;

vii.    the Policy provided the requested comprehensive full replacement coverage;

viii.    the Policy was not subject to any exclusions, limitation, or conditions;

ix.    the Policy covered all fortuitous losses;

x.    the Policy fully covered weather-related damage (even cosmetic, whether big or small);

xi.    Stansel was an expert, who was proficient in accurately calculating replacement cost values using Allstate's valuation software;

xii.    Stansel applied first-hand knowledge it obtained from inspections of Plaintiff's Insured Property (including the structure, roof, specific amenities, construction qualities, age, and condition) to calculate the replacement cost values using Allstate's valuation software;

xiii.    the replacement cost valuation (as calculated by Stansel) was accurate and commensurate with current market and reconstruction costs in an amount necessary for Plaintiff to replace and/or rebuild Plaintiff's Insured Property back to its pre-loss condition in the event of a loss;

xiv.    the replacement cost valuation (and as calculated by Stansel), and for which premiums were paid, was equal to the estimated

21

replacement cost (100% insurance-to-value);

xv.    the valuation software utilized was accurate and commensurate with the estimating software that would be used in claims;

xvi.    Defendants followed and met Allstate's underwriting policies/guidelines; and

xvii.    Defendants properly conducted all necessary inspections of the Insured Property.

xviii.    The new Allstate Policy would not provide 100% full replacement cost value for Plaintiff's roof as was the case in Plaintiff's SafeCo policy.

57.    Each of the forgoing representations or omissions were material, inaccurate, misleading, and/or false. Indeed, Allstate's captive agents cannot bind a replacement cost policy without first affirmatively representing that the property to be insured satisfies Allstate's underwriting guidelines. Should the property fail to satisfy the guidelines, the policy cannot bind. Accordingly, in every instance wherein an Allstate agent issues a replacement cost policy, the agent must first represent the home meets Allstate's underwriting guidelines. This representation necessarily includes a representation that the home is free from pre-existing damage that would violate those same guidelines. Indeed, properties with pre-existing damage, including and especially defective workmanship and/or improper "hail nail" installation of the shingles, do not qualify under these guidelines and are deemed an unacceptable risk to Allstate. Had Stansel not represented Plaintiff's Insured Property met Allstate's underwriting guidelines, the Policy would not have been issued. Had Stansel disclosed to Plaintiff that her Allstate Policy would only cover 67% of replacement cost value to her roof, Plaintiff would never have agreed to purchase the

22

Allstate Policy. Stansel's false misrepresentation and/or concealment of the condition of the Insured Property and/or full replacement cost value of the roof as Plaintiff then enjoyed via her SafeCo Policy ensured the purchase, continuance, and renewal of coverage to Plaintiff's detriment.

58. As a result of Stansel's breach of duty, it gained an advantage for itself by misleading Plaintiff to Plaintiff's prejudice.

59. Stansel's materal misrepresentations and/or ommissions constitue constructive fraud and the duty to speak under Oklahoma law.

60. Plaintiff was induced to accept, purchase, and renew the Allstate replacement cost policy by Stansel's misrepresentations, ommissions, and constructive fraud.

61. Plaintiff was misled by Stansel's misrepresentations, omissions, and constructive fraud. Plaintiff relied on Stansel's misrepresentations to Plaintiff's detriment.

62. Stansel is the agent and/or ostensible agent of Allstate for purposes of these misrepresentations and/or omissions, and as such is vicariously liable for them.

63. As a result of the Defendants' constructive fraud, ommissions, and/or misrepresentation, Plaintiff has sustained damages, including deprivation of monies rightfully belonging to Plaintiff, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering, and have been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

64. Defendants' conduct was intentional, willful, malicious, and in reckless disregard of the rights of the Plaintiff and/or was grossly negligent. Defendants' conduct is sufficiently egregious in nature to warrant the imposition of punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Taylor Austin prays for judgment against Defendants Allstate

Vehicle and Property Insurance Company and Stansel Insurance Agency, Inc. for:

(a)    Actual and punitive damages each in an amount in excess of $75,000.00;

(b)    Disgorgement of the increased financial benefits derived by any and/or all of the

Defendants as a direct result of the Defendants' wrongful conduct; and

(c)    Prejudgment interest, costs and attorneys' fees.

Respectfully submitted,

*Blake Sonne*

Reggie N. Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
Randa Reeves, OBA No. 30695
Blake Sonne, OBA No. 20341
**WHITTEN BURRAGE**
512 North Broadway Avenue, Suite 300
Oklahoma City, OK 73102
Telephone:    405.516.7800
Facsimile:    405.516.7859
Email: rwhitten@whittenburragelaw.com
        mburrage@whittenburragelaw.com
        rreeves@whittenburragelaw.com
        bsonne@whittenburragelaw.com
**ATTORNEYS FOR PLAINTIFF**

**ATTORNEYS' LIEN CLAIMED**
**JURY TRIAL DEMANDED**

24